S08A1677. DAVIS v. THE STATE.
(674 SE2d 879)

HINES, Justice.

Freddie Lee Davis appeals his convictions for malice murder, aggravated assault, and armed robbery in connection with the deaths of Bernice Thomas and James Newsome. For the reasons that follow, we reverse.[1]

Construed to support the verdicts, the evidence showed that

---

[1] Thomas and Newsome were killed on June 14, 2000. On October 25, 2001, a Brooks County grand jury indicted Davis for the malice murder of Thomas, the felony murder of Thomas while in the commission of aggravated assault, the aggravated assault of Thomas, the malice murder of Newsome, the felony murder of Newsome while in the commission of aggravated assault, the aggravated assault of Newsome, and the armed robbery of Newsome. Davis was tried before a jury May 19-23, 2003, and a mistrial was declared when the jury could not reach verdicts. Davis was again tried before a jury March 1-5, 2004, and found guilty of all charges. On March 5, 2004, Davis was sentenced to life in prison for the malice murder of Thomas, and concurrent terms of life in prison for the malice murder of Newsome, 20 years in prison for the aggravated assault of Thomas, 20 years in prison for the aggravated assault of Newsome, and life in prison for the armed robbery of Newsome; the convictions for felony murder stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372-374 (4) (434 SE2d 479) (1993). Davis moved for a new trial on April 1, 2004, and amended the motion on July 23, 2007. The motion was denied on September 25, 2007, and Davis filed a notice of appeal on October 22, 2007. The appeal was docketed in this Court on June 23, 2008, and submitted for decision on January 5, 2009.

Thomas was Davis's sister. On the morning of June 14, 2000, Thomas's body was discovered in the Quitman, Georgia residence of Newsome, her boyfriend; Newsome was found alive, but died later due to complications of blunt force trauma to the head, which was also the cause of Thomas's death. Newsome had won $500 in a lottery two days earlier; he kept his money in a paperclip in his back pocket, but no money was found on his body.

Thomas's body was in a bedroom; blood was spattered on the walls, ceiling, and floor. On the bed was a woman's purse with its contents poured out. Thomas's trauma was caused by a narrow, heavy object such as a tire iron, thin pipe, or screwdriver. A heavy-duty floor jack with a missing handle was found on the house's back porch.

Davis's niece and other witnesses saw Davis in Quitman during the days before the crimes were discovered. During this period of time, Davis asked Tammy Travis if she knew where he could borrow some money and stated that his sister had a check for $1,200. Davis went to Kendrick Manning's house to buy drugs before the murders occurred. Davis did not have any money and asked for the drugs on credit, stating that he would get money from his sister and return later. He returned one or two hours later and gave Manning a $100 bill. When asked what was wrong, Davis stated that "he regret[ted] what he just done to his sister."

The week before Newsome was murdered, he was given a business card of Adams Lawnmower Repair. Such a card was found in Davis's car trunk. The owner of the repair service never gave a business card to Davis, but had distributed a thousand or more of them in Quitman.

During a GBI interview on June 28, 2000, Davis denied being in Quitman in the two years prior to the murders, and stated that at the time of their occurrence, he was in Florida. Later he admitted to being in Quitman the week of the murders.

1. The evidence was sufficient to enable a rational trier of fact to find Davis guilty beyond a reasonable doubt of all the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Davis contends that the trial court erred in not instructing the jury on the principle set forth in OCGA § 24-4-6, i.e., "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." The State contends that no such instruction was required because Davis did not submit a written request for it. However, this is not so.

Davis's written "REQUEST FOR CHARGES TO THE JURY" included in it the language "FROM VOLUME II, 3RD EDITION OF

SUGGESTED PATTERN JURY INSTRUCTIONS." This document contained 28 requests, was numbered sequentially, and consisted of three pages; the last request stated that it was for the principle of law of "Two Theories," and identified "Page 11, Par. 1.30.30." On page 11 of Volume II: Criminal Cases, Third Edition, Suggested Pattern Jury Instructions, Paragraph 1.30.30, there appears in bold print, "Two Theories; Guilt and Innocence," followed by "(*This former charge was removed as a result of Langston v. State*, 208 Ga. App. 175 [1993].)" (Italics in original.) Paragraph 1.30.30 continues with the text: "To warrant a conviction on circumstantial evidence, the proven facts must not only be consistent with the theory of guilt but also exclude every other reasonable theory other than the guilt of the accused." This is virtually the same language set forth in OCGA § 24-4-6, the principle that Davis argues on appeal should have been charged to the jury.

Uniform Superior Court Rule ("USCR") 10.3 reads:

> All requests to charge shall be numbered consecutively on separate sheets of paper and submitted to the court in duplicate by counsel for all parties at the commencement of trial, unless otherwise provided by pre-trial order; provided, however, that additional requests may be submitted to cover unanticipated points which arise thereafter.

Davis's requests for jury instructions did not comply with USCR 10.3, as they were not "numbered consecutively on separate sheets of paper . . . ." However, this Court has never declared that failure to comply with the letter of USCR 10.3 results in the waiver of written requests.[2] The Court of Appeals has observed that "[v]iolation of Rule 10.3 carries no express penalties, although failure to adhere to the rule has been cited as justification for a trial court's refusal to give a later requested charge." *Gagnon v. State*, 240 Ga. App. 754, 755 (1) (525 SE2d 127) (1999) (addressing the timeliness of a written request) (citations omitted). And, the practice followed here has not resulted in a request to charge that is so broad that it is not "legal, apt, and *precisely* adjusted to some principle involved in the case and . . . authorized by the evidence." *Lane v. State*, 268 Ga. 678, 680 (2) (492 SE2d 230) (1997) (citation and punctuation omitted). Rather, the request directed the court's attention to the specific page and paragraph of the Suggested Pattern Jury Instructions containing the desired instruction.

---

[2] In *State v. Johnson*, 280 Ga. 511, 512, n. 2 (630 SE2d 377) (2006), this Court noted that a similar method of submitting requests for jury instructions had been followed, and left unresolved the question of whether it met the direction of USCR 10.3.

While the trial court might have been authorized to reject Davis's requests to charge the jury for failure to comply with USCR 10.3, see *Smith v. State*, 222 Ga. App. 366, 370 (5) (474 SE2d 272) (1996), that is not what occurred. The court considered the request at issue, and obviously followed Davis's reference to the Suggested Pattern Jury Instructions, noting during the charge conference that "[t]he charge book specifically says it's no longer valid." However, what was declared invalid in *Langston v. State*, 208 Ga. App. 175 (430 SE2d 365) (1993), is not the principle found in OCGA § 24-4-6, but the language that was formerly known as the "Two Theories" charge, which appeared in former Suggested Pattern Jury Instructions as, "[w]here all the facts and circumstances of the case, and all reasonable deductions therefrom, present two equal theories, one of guilt and the other of innocence, then the jury must acquit the accused." *Langston*, supra at 175 (punctuation omitted). See also Suggested Pattern Jury Instructions, Criminal Cases (1st ed.), p. 22, item B. As *Langston* noted, the language of OCGA § 24-4-6 properly directs the jury's attention to the use of circumstantial evidence, while the former "Two Theories" charge did not. Supra at 177.

The circumstance that at the time of trial, the then current Suggested Pattern Jury Instructions unwisely had valid instruction language displayed below the heading: "Two Theories; Guilt and Innocence,"[3] is of no moment; Davis's request directed the trial court to the language he wished to have the court use in instructing the jury, and the court recognized what was requested, stating during the charge conference that, "I think that will be covered in direct and circumstantial evidence." However, the court's instruction on direct and circumstantial evidence did not address the principle of law set forth in OCGA § 24-4-6.[4] Accordingly, it cannot be said that Davis's request to charge the principle stated in OCGA § 24-4-6 was waived by his failure to properly submit the request in writing.

---

[3] Although the current edition of the Suggested Pattern Jury Instructions still contains the heading: "Two Theories; Guilt and Innocence," no charge language appears under that heading. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.30.30 (4th ed. 2007).

[4] The court's instruction on direct and circumstantial evidence did not cover the principle of OCGA § 24-4-6. The court charged:

> Evidence may be direct or circumstantial, or both. Direct evidence is evidence that points immediately to the question at issue. Evidence may also be used to prove a fact by inference. This is referred to as circumstantial evidence. Circumstantial evidence is the proven facts or circumstances by direct evidence from which you may infer other related or connected facts that are reasonable and justified in the light of your experience. By way of example, if a witness testified that he saw it snowing, then that would be direct evidence of the fact that it snowed. If no one saw it snowing, but the ground is covered with fresh snow, then that is indirect evidence that it recently snowed.

The State's case against Davis was largely circumstantial, and an instruction on the law stated in OCGA § 24-4-6 was warranted.

> A trial court must charge on the law of circumstantial evidence, OCGA § 24-4-6, even absent a request if the case against the defendant is wholly circumstantial; *if the case relies to any degree upon circumstantial evidence, a charge on circumstantial evidence is required upon written request.* [Cit.] Appellant made a written request to charge the jury on the law of circumstantial evidence applicable in a criminal case as provided by OCGA § 24-4-6. Appellant's requested charge was a proper statement of the law of circumstantial evidence. [Cits.] Thus, the trial court erred by failing to give a requested charge on OCGA § 24-4-6 in this criminal case which depended, in part, on circumstantial evidence.

*Massey v. State*, 270 Ga. 76, 77 (2) (a) (508 SE2d 149) (1998) (emphasis supplied).

Nor was the evidence against Davis overwhelming. The only direct evidence of Davis's guilt was his statement to Manning that he "regret[ted] what he just done to his sister." See *Sumlin v. State*, 283 Ga. 264, 265 (1) (658 SE2d 596) (2008). No fingerprint, hair, or fiber evidence linked Davis to the crime scene; his car was searched for blood stains that might have been transferred from clothing, and none were found. A white t-shirt with dark stains that an investigating officer suspected was blood was seized from the trunk of Davis's car, the stains were tested for the presence of blood, and none was found; stains on a striped shirt from his car trunk also failed to show the presence of blood.

Three witnesses testified that they saw Davis with blood on his shirt after the crimes. Manning testified that when Davis returned to pay him for the drugs, both his shirt and the $100 bill he gave Manning had blood on them. Manning had previously given an interview to law enforcement investigators, whom he contacted seven months after the killings, at a time when he was incarcerated. In that interview, he was asked if he saw any blood on Davis, and he said no, and he made no mention of blood on the $100 bill. Manning testified that he offered to cooperate with the law enforcement officers in the hope of obtaining leniency in sentencing, and that while both he and Davis were incarcerated, he wore a listening device and attempted to get Davis to incriminate himself, but he did not. Evidence was also introduced regarding Manning's four prior felony convictions, and he testified that, after talking to the law enforcement investigators in Davis's case, the charges in another indict-

ment were dismissed.[5] The other two witnesses, who were mother and son, testified at trial that they had seen blood on Davis's shirt, the mother specifying that it was a white t-shirt. These witnesses also were confronted with their prior statements to investigating law enforcement officers, which likewise did not mention any blood on Davis's shirt. Their relative, who testified that Davis said that his sister had a check for $1,200, was also confronted with her statement to investigating officers, which did not contain any reference to such a report.

During the cross-examination of various witnesses, Davis elicited testimony that his car was in need of brake work, and that he was working on his car during the time he was seen with dark liquid on his shirt. The law enforcement officer who removed the shirts from the trunk of Davis's car testified that the car trunk "had the smell of gasoline or brake fluid or something" and that a container of brake fluid was found in the trunk. Davis also elicited testimony that Milton Goins, a drug dealer in the neighborhood, was in need of money at the time of the crimes, and fled when law enforcement investigators attempted to question him.

Evidence showed that Newsome sold alcoholic beverages by the glass from his home, various persons regularly loitered near there, and his winning $500 in the lottery was known to many people in the neighborhood. During deliberations, the jury informed the court that it was deadlocked. The court instructed it to continue deliberations, and it did not render verdicts until the next day.[6] Accordingly, under these circumstances, we cannot conclude that the evidence against Davis was so overwhelming as to render it highly improbable that the jury's verdicts were unaffected by the failure to give the warranted jury instruction. See *Mims v. State*, 264 Ga. 271, 273 (443 SE2d 845) (1994). Compare *Bradwell v. State*, 262 Ga. App. 651, 652-653 (1) (586 SE2d 355) (2003). See also *Holsey v. State*, 281 Ga. 177, 180 (3) (637 SE2d 32) (2006).[7]

*Judgments reversed. All the Justices concur.*

DECIDED MARCH 23, 2009.

*William D. Edwards*, for appellant.
*J. David Miller, District Attorney, Justo C. Cabral III, Bradfield*

---

[5] The jury was instructed on the law pertaining to the credibility of witnesses due to any agreement regarding leniency from criminal prosecution, and was also instructed on the law of impeachment.

[6] As noted in footnote 1, supra, this was Davis's second trial under this indictment, the first ending in a mistrial when the jury was unable to reach verdicts.

[7] We have reviewed Davis's remaining enumerations of error, and find that they are either without merit or unlikely to recur on retrial.

*M. Shealy, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Sara K. Sahni, Assistant Attorney General*, for appellee.